## WILLIAMS v. SYRACUSE & S. R. CO.

(Circuit Court, N. D. New York. May 11, 1908.)

No. 7,139.

PATENTS—DESIGNS—INSULATING PLUG FOR ELECTRIC-LINE SUPPORTS.

The Williams design patent, No. 31,838, for a design for an insulating plug for electric-line supports, is void, because the article shown is not a proper subject for a design patent, not being intended for display or ornament, and when in use being covered, so that the design cannot be seen, also for anticipation and lack of invention, in view of the prior art, it being shown that the alleged infringing article was made, advertised, and sold several years before the patent was applied for.

In Equity. This is a suit to restrain alleged infringement of a design patent for insulating plug for electric-line supports, and for an accounting. Among the defenses are want of patentable novelty in view of the prior art, that this is not the proper subject of a design patent, and prior use and anticipation.

Dennis W. Hunt (H. T. Fenton, of counsel), for complainant.

Brown, Darby & Hopkins (Frank T. Brown and Francis A. Hopkins, of counsel), for defendant.

RAY, District Judge. The patent in suit, No. 31,838, to Luzerne A. Williams, for "design for an insulating plug for electric-line supports," was applied for October 17, 1899, and issued November 14, 1899, and I find no claim or evidence that the alleged invention antedates the application. Drawings accompany the specifications. On the final hearing complainant's counsel stated that no plug of this design has ever been made by plaintiff, or by any one for him; and hence we are confined to the drawings and specifications for a description and an understanding of the exact design claimed. The Ohio Brass Company, which makes and sells the alleged infringing device, is defending this action. It is conceded that the plugs made by it are substantially like those of the patent in suit. The patentee says, and this quotation embraces the sole claim of the patent in suit:

"The leading feature of my design consists of an insulating-plug for electric-line supports, which, when viewed in front elevation, presents substantially the appearance of a T, having the lower end of its upright branch reduced in diameter, and when viewed in plan presents the appearance of substantially circular concentric surfaces and angularly-arranged surfaces inclosed between two of said concentric surfaces. A and B are respectively the transverse and upright branches of an insulating-plug embodying my design. The transverse branch, A, is of substantially the same size from top to bottom, its outline presenting a substantially oblong parallelogrammatic appearance in elevation, and a substantially circular appearance in plan view. The upright branch, B, is substantially cylindrical, and is also of the same size from top to bottom, with the exception of its lower end, which is formed with upper and lower reduced portions, b, b¹, the upper portion b, being provided with angularly-arranged surfaces, b², having their adjacent ends separated and merged in the substantially circular outline of the main body of said branch, when viewed in inverted plan, and the portion, b¹, being substantially cylindrical and provided with a spiral raised surface, b³. An insulating-plug for electric-line supports embodying my design presents a pleasing and characteristic appearance. What I claim is: The design for an insulating-plug for electric-line supports, substantially as shown and described."

The base or foundation of this plug is formed of metal, and covered by insulating material, except at the lower end, where it is to be screwed into the support, trolley ear, or clamp on the line, but the insulating material is so applied as to make the completed plug of the design described. In point of fact this plug is of the same general shape and contour of the ordinary round bolt, with a round or circular head, having screw threads at the lower end, which is the "spiral raised surface, b," and also, what is not common to cylindrical bolts, a nut portion near the lower end, integral with the stem or body part of the plug, and which is not added for beauty or ornamentation, but for utility; that is, as a means for applying the wrench, when it is desired to screw the plug into or out of the support, trolley ear, or clamp on the line. Assuming that the head of this bolt or plug is necessary for mechanical purposes when put in actual use, and that the nut portion is also necessary for mechanical purposes, and that it is desirable to have the whole of a pleasing appearance when on the line and in use, so as not to disfigure the landscape, we find nothing new or novel in the cylindrical head of the plug, or in the cylindrical stem or body thereof, or in the nut portion near the lower end, unless it be its shape, and certainly there is nothing new or novel in the threaded end, "spiral raised surface," which screws into the support, trolley ear, or clamp. Whether this "spiral raised surface" is raised, made broader than the main part of the body, or not, is entirely immaterial so far as appearance is concerned; for it disappears from sight when in actual use, being secured into the support on the line. And it may as well be stated here that the entire insulating-plug, except the nut portion, disappears from view, is entirely covered by the hanger on the wires into which it fits, when in actual use. There is no evidence or pretense that this plug is more attractive to customers or users, or more salable, of greater market value, or more in demand, on account of its design or shape. When in actual use on the line, and covered by the hanger, as necessarily it is, only the nut part can be seen, and the hanger does not necessarily conform, in any respect, to the shape of the plug, but presents more the appearance of a spool, with flanges near the center, which support or carry the wire. In no event, whether in the market or in use, does it present any attractive feature or ornamental appearance. These insulating-plugs are not made for ornamental purposes in any situation. They do not change or modify the general appearance of the electric line or electric-line supports. That general appearance is determined by the shape of the hanger and trolley ear or clamp.

The complainant has put in evidence a photograph of the insulating-plug (so far as it can be seen when in use) and support in use by the defendant, complainant's exhibit of July 16, 1907, taken July 5, 1907, and the witness, Charles K. King, vice president of the Ohio Brass Company, says:

"The Syracuse & Suburban Railroad Company are using our type, D, insulated bolts, and are therefore using an insulated bolt, which is almost identically the same in design as the design shown in the Williams patent."

Infringement may therefore be conceded if this Williams patent in suit is valid.

The law as to design patents provides (Rev. St. U. S. § 4929 [U. S. Comp. St. 1901, p. 3398]):

"Sec. 4929. Any person who, by his own industry, genius, efforts and expense, has invented and produced any new and original design for a manufacture. * * * the same not having been known or used by others before his invention or production thereof, or patented or described in any printed publication, may, upon payment of the fee prescribed, and other due proceedings had the same as in cases of inventions or discoveries, obtain a patent therefor."

In view of the decisions of the Circuit Court of Appeals of the Second Circuit, by which this court is bound, and of the absence of evidence that this insulating-plug is a thing of beauty, intended for ornamentation or display, or that, because of its design, it possesses added commercial value, or is more in demand, and in view of the fact that it is intended for use in an obscure place, where it cannot be seen or admired, and is so used, I do not see how I can hold this patent valid.

In Rowe v. Blodgett, 112 Fed. 61, 50 C. C. A. 120, that court had under consideration a patent for an ornamental design for a horseshoe calk, a thing that is seen much more and much oftener and by more people than is the insulating plug of a trolley line, and held it not the proper subject of a design patent. Every horseman and every owner of a horse, of which there are tens of thousands in the United States, sees the shod foot of the horse, and realizes that the shape of the shoe has much to do with the appearance of the horse, but the Circuit Court of Appeals said:

" * * * Patents for designs are intended to apply to matters of ornamentation, in which the utility depends upon the pleasing effect imparted to the eye, and not upon any new function. Design patents refer to appearance, not utility. Their object is to encourage works of art and decoration which appeal to the eye, and the esthetic emotions, and the beautiful. A horseshoe calk is a mere bit of iron or steel, not intended for display, but for an obscure use."

In Bradley v. Eccles, 126 Fed. 945, 949, 61 C. C. A. 669, the design patent was for a washer for thill couplings. This court had held it valid ([C. C.] 122 Fed. 875) on the ground the patentee had—

" 'a new, useful, and original shape or configuration' of an article of manufacture; that the article of manufacture itself is not designed or intended for an ornament, or for ornamental purposes, but for use as an essential and useful part of vehicles drawn by animals, but that the complainant's design makes such article of manufacture, when displayed or offered for sale in the market, or used as an ornament in carriage factories and carriage houses, ornamental and attractive, and pleasing to the eye and senses of all who see it—both sellers, purchasers, owners, users, and observers—and consequently more valuable, both as an article of merchandise and as an article of use."

The Circuit Court of Appeals (126 Fed. 945, 61 C. C. A. 673), reversed, and said:

"The first patent included in the second suit, No. 28,571, May 10, 1898, is for 'design for a washer for thill couplers.' The specification states that: 'This design relates to the configuration of a washer for thill couplings. The essential feature of my design consists in an approximately spherical body,

·which is truncated at both ends, and divided longitudinally at one side.' The subject of the patent is the identical, integral, spherical, truncated washer we have just been considering, which is placed in the recess of the draft-eye as packing for the knuckle of the thill-iron. When so placed, it is as much out of sight as was the horseshoe calk in Rowe v. Blodgett, 112 Fed. 61, 50 C. C. A. 120, with which cause the one at bar seems to be on all fours. It is another instance of the 'liberal,' if not lax, practice in issuing design patents, which was therein referred to. The washer, like the horseshoe calk, is not intended for display, but for an obscure use. There is no evidence that its form appeals in any way to the eye, or serves to commend it to purchasers and users as a thing of beauty. There is not a scintilla of evidence that the sale of a single washer was ever induced by reason of any attractiveness in its appearance. Functional utility entitled the patentee to the mechanical patent already discussed, but mere functional utility did not entitle him to a design patent for the same article."

In Eaton v. Lewis (C. C.) 115 Fed. 635, Judge Wheeler followed the Circuit Court of Appeals, holding the advantage of the design for fastening plates for uniting the ends of machinery belts was mechanical, and not esthetic, and that their appearance, when in use, would be wholly immaterial. In Wagner Typewriter Co. v. Webster Co. (C. C.) 144 Fed. 405, a design patent for a metal spool for use in a typewriter, also an article of manufacture and commerce, was held invalid, and the court said:

"This metal spool is not designed for display, but for an obscure use. It cannot be seen by the user of the machine, except as he or she bends forward, and the bystander must bend over the machine or it is hid from view."

It is evident, I think, in view of the use to which this device is put, and must be put, especially in the absence of proof that the design does not enhance its marketability, or market value, or utility, that it is not the proper subject of a design patent. It is used overhead, out of reach, and out of sight to the naked eye so far as its design is concerned, and, as stated, when in use, it is covered up. Whether its head and body are cylindrical or octagonal is immaterial; whether the nut part is hexagonal or polygonal or of some other shape is immaterial, unless it be from the point of utility. Several of these insulating-plugs, such as are used by the defendant, are in evidence, attached to and covered by the support, so that there is complete evidence as to their obscure position, etc., when in actual use. There is nothing new or novel in the appearance of a round bolt having a cylindrical head, and having the lower end of its upright branch reduced in diameter with the lower end screw-threaded. To add the nut projection just above the screw thread adds nothing to its beauty, although it may add to its utility for certain purposes. In no event is it added for the sake of ornamentation. The outside appearance of it is of little consequence. The "upper reduced portion" of the lower end is reduced by, so to speak, taking a slice off from each of the four sides of the cylinder, not cutting so deep but that the corners between these "angularly arranged surfaces" are left rounded; that is, not cut away. To conceive the idea of making a nut from a round piece of metal, already boxed and threaded, by squaring the four sides, and leaving the corners rounded, is not, to my mind, a patentable conception, even in a design patent. As I have before me, while

writing, a glass inkstand, which I have used for at least 30 years, of this precise design, it is perhaps difficult for me to see novelty and special ornamentation, deserving of a patent in 1899, in so forming the lower end of an insulating bolt or plug. While this inkstand is not in evidence, and, under the decisions of the Circuit Court of Appeals, I am precluded from considering it, we have a portion at least of the prior art in evidence; and, so far as I can see or judge, we have very nearly this exact design, for insulating plugs for electric-line supports, disclosed therein. The nut portion may be cut octagonal, polygonal, sextagonal, or in any desired shape, of course. The only limitation is that it must be so cut that a wrench may be applied to turn it.

Turning to the prior art, not design patents, we have United States letters patent to Cicott, Belcher, and Billings, assignors to Billings & Spencer Company, for insulated support for trolley lines, dated August 27, 1895, and which patented device includes the insulating-plug, which is fully shown and quite fully described therein, and shows a plug almost the exact counterpart of that of the patent in suit. It is of metal, and covered with insulating material, which conforms in shape to the metal base or foundation. The insulating material extends down to the nut portion. The insulated plug (support in this Cicott patent) is thus described:

"The improved insulated support comprises a central stud, 10, provided at its upper end with a head, 11, and at its lower end with a screw-thread, 12, adapted to be screwed into the carrier, 13, employed to grasp or directly hold the trolley line wire as shown in Fig. 2. Said stud is also provided near its lower end, with a head, 14, having a polygonal portion, 15, onto which a wrench may be applied to screw the stud in the trolley line carrier, 13. The upper head and cylindrical portion of this stud is covered and surrounded by any suitable insulating material, 16, such as hard rubber, and in practice this material is preferably made about one-fourth of an inch in thickness throughout the extent thereof, so that, as shown in Fig. 2 of the drawings, the insulated material will form a thimble comprising a cylindrical portion and a head, said head having a circular flange, 17, adapted to rest upon the upper edge of the sleeve, 19, of the protector hereinafter described, said insulating material thereby forming, together with the stud, an improved insulator-stud (designed generally as 60), which the bell-shaped protector, hereinafter described, is adapted to incircle."

The central stud with its head are the same as the "transverse and upright branches" of Williams, and the shape is the same, cylindrical "head," transverse branch, of the same size from top to bottom, and presents a substantially oblong parallelogrammatic appearance in elevation, and a substantially circular appearance in plan view, with central stud, "upright branch," cylindrical, of substantially the same size from top to bottom, with the exception of its lower end, which has upper and lower reduced portions, the upper reduced or nut portion being the "head, 14, having a polygonal portion, 15, onto which a wrench may be applied to screw the stud in the trolley line carrier, 13," this polygonal portion being the same as the upper portion of Williams, with angularly arranged surfaces, and the lower reduced portion being the screw-threaded part, "substantially cylindrical," and provided with a "spiral raised surface" the same as Williams. The only differences between the plug of Williams and the plug or "insulated support" of Cicott is that the nut portion of Williams has or

shows, as his "angularly-arranged surfaces b²" (nut portion), four flat sides and four rounded corners, while Cicott has, in the same nut portion, four flat sides and four flat corners, and in Williams the insulating material extends down to cover the rounded corners of the nut portion, while in Cicott it does not cover the corresponding corners. In the Billings and Spencer exhibit "Insulating-Stud" the nut portion has six flat surfaces, with six rounded corners, thus reducing the size of the upper portion, with the screw-threaded part, still smaller below. Both Williams and Cicott, when viewed in front elevation, present substantially the appearance of a T, as does any similar bolt or nail, and, when viewed in plan, present the appearance of substantially circular concentric surfaces, and angularly arranged surfaces inclosed between two of said concentric surfaces. All this is not only shown in the drawings, but is perfectly apparent on inspection of the photograph and various devices in evidence.

If Williams had the prior art before him, or was familiar with it, he must have known he was making a substantial copy of Cicott, and obtaining a patent on that design. They are not precisely alike, but the changes are slight and immaterial. There is nothing in Williams' variations that amounts to patentable invention, even if this plug is the proper subject of a design patent. In design and in mechanical and process patents there must be "invention."

Turning to the Ball patent, No. 518,213, of April 17, 1894, the Lee patents of October 25, 1892, and February 2, 1892, Nos. 485,105, 467,942, respectively, and the Luscomb patent of August 14, 1894, No. 524,467, we have the same general form and design, with some variation in the lower ends of the several plugs, but it is evident that, having in view the prior art, Williams does not disclose invention.

The complainant has not put in evidence one of the plugs used by the defendant. Neither has the defendant nor the Ohio Brass Company. The photograph is in evidence, but from this it is impossible to say that the defendant's plug is of the same precise design as Williams. The complainant relies upon the evidence of Luzerne A. Williams and of Charles E. Hubbell to show infringement. Neither testifies that the design of defendant's plugs is the same as that shown in the Williams patent. Williams says:

"Well, upon comparing of these plugs, they all have an almost identical appearance."

"Q. 28. And to the best of your knowledge and belief how many of those plugs of that design, or covered by your letters patent, were in use? A. I should say twelve to fifteen hundred, eighteen hundred, perhaps."

"Q. 69. I will now ask you if the plugs that you have observed in use by this defendant are identically the same as described in your letters patent, covering the design of which you claim to be the patentee? A. They have every appearance of it."

Hubbell, who is familiar with the plugs used by defendant, and who had the patent in suit before him, said, in answer to question 23, "Well, there is something similar to that we have in use; yes," and, in answer to question 28, "I just said they were similar to the ones in use," and "I don't see any difference." This is sufficient to show that the plugs used by defendant are the same in general appearance to

the plugs shown in Williams' drawings, but Hubbell was not an expert, and his cross-examination discloses that his evidence is not persuasive that the defendants are using the exact design of the Williams patent. What the evidence in the whole does disclose is that the defendant is using insulating plugs for electric-line supports, made by the Ohio Brass Company, of the same general design and of nearly the exact design shown in the Williams patent and drawings, and that it was making and selling them, and that they were in common use a long time prior to the filing of the Williams application. The Billings and Spencer Company were also making and selling plugs of substantially the same design in 1895. The evidence on this part of the case is very clear and conclusive. It does not rest upon mere memory, but is shown by long-used plugs, by books and written entries and documents, clearly old and genuine, and by printed illustrated catalogues and price lists, which antedate complainant's application. In defendant's exhibit, Ohio Brass Catalogue, No. 3, of 1895, we have type D of this company's trolley wire hangers in section showing the entire design and construction, including hanger, and showing the bolt or plug and its inclosure of insulating material, the head, the nut portion, and the screw-threaded portion, also type D of the bolt or plug by itself, and also the "insulated bolt, west end type." In the Billings and Spencer Illustrated Catalogue of 1895 we have its straight line hanger, showing bolt with head, insulation, nut, and screw-threaded portion, in section, and also the "colophite or vulcanized rubber insulated stud," and also the steel stud by itself. All these were made and in use prior to the complainant's application for his design patent. This design patent is merely descriptive of the design of the plugs of the prior art, with one or two very slight changes—changes which in no way add to the general attractiveness or appearance of the plug Complainant's design is not new. It is an old design, slightly modified, and then patented. If the design, as patented by Williams, is valid, the proof fails to show infringement thereof by the defendant. It is using plugs made by the Ohio Brass Company, which vary as much in design from that of the Williams patent as does the Williams patent from the prior art of design patents. In short the defendant is using the design of the prior art, and not the Williams design at all, except in so far as Williams copies the prior art. This the defendant has the right to do. If Williams has something new in his design which defendant does not have, he cannot, by copying the prior art as to the balance of his design, preclude others from using the old design, even if they add something or make changes, provided they do not copy Williams' addition. If Williams has an improved design, defendant is not shown to use it.

If inquiry is made, "Does the defendant's plug present the same general appearance to the ordinary observer as does the Williams' plug, judging from his drawings and specifications?" The answer is "yes." It cannot be otherwise. But defendant is using a plug that has been made and on the market since 1895 at least, and described and shown in printed publications descriptive of the art. It is, of course, true that in design patents the test of sameness and of infringement is, "Do the two things present to the eyes of the ordinary

observer and purchaser and user the same general appearance?" See Smith v. Whitman Saddle Co., 148 U. S. 674, 13 Sup. Ct. 768, 37 L. Ed. 606; Ripley v. Elson-Glass Co. (C. C.) 49 Fed. 927, 930; Redway v. Ohio Stove Co. (C. C.) 38 Fed. 582; Monroe v. Anderson, 58 Fed. 398, 400, 7 C. C. A. 272; Root v. Ball, 4 McLean, 177, Fed. Cas. No. 12,035; Kraus v. Fitzpatrick (C. C.) 34 Fed. 39; Gorham Mfg. Co. v. White, 14 Wall. 511, 20 L. Ed. 731. This must be the test as to invention, and as to the newness and originality of the patented design, and, also, as to anticipation. That which infringes, if subsequent, anticipates, if prior.

In Smith v. Saddle Co., 148 U. S. 674, 13 Sup. Ct. 768, 37 L. Ed. 606, the Supreme Court of the United States said:

"The shape produced must be the result of industry, effort, genius, or expense, and new and original as applied to articles of manufacture. Foster v. Crossin (C. C.) 44 Fed. 62. The exercise of the inventive or originative faculty is required, and a person cannot be permitted to select an existing form, and simply put it to a new use any more than he can be permitted to take a patent for the mere double use of a machine. If, however, the selection and adaptation of an existing form is more than the exercise of the imitative faculty, and the result is, in effect, a new creation, the design may be patentable."

In the same case the Supreme Court quoted and approved Judge Brown, later Mr. Justice Brown, in Northrup v. Adams, 12 O. G. 430, Fed. Cas. No. 10,328:

"To entitle a party to the benefit of the act, in either case, there must be originality and the exercise of the inventive faculty. In the one there must be novelty and utility; in the other originality and beauty. Mere mechanical skill is insufficient. There must be something akin to genius—an effort of the brain as well as the hand. The adaptation of old devices or forms to new purposes, however convenient, useful, or beautiful they may be in their new role, is not invention."

Without going into quotations of the evidence given by defendant's witness as to prior use of this design, and anticipation which is clear and satisfactory and convincing beyond a reasonable doubt, I am satisfied that, in view of the use to which these plugs are intended to be put, and are put, they are not the proper subject of a design patent; (2) that, conceding the validity of complainant's patent, infringement by defendant is not sufficiently proved; (3) that the defense of anticipation is clearly made out beyond a reasonable doubt; (4) no invention is shown in view of the art.

It follows that the bill of complaint must be dismissed, with costs.